Memorandum of Decision
This is a petition alleging the neglect of three children Brandon C., born October 19, 1986 and Cameron C. born October 5, 1990, and their older half brother Allen born Sept. 9, 1983. The court heard three days of testimony from witnesses including James C., the paternal grandfather, his wife Hazel (a/k/a Duchess), their two daughters Marteeta, and Tammy and a family pastor from their North Carolina Baptist church, John Wayne France. The court also heard from two foster mothers, social workers, police, the children's therapist and Dr. David Mantell, a licensed clinical psychologist, appointed by the court, who interviewed significant adults and the children. The court interviewed the child, Brandon, in chambers. Having reviewed the documentary evidence and testimony of the witnesses the court CT Page 13634 makes the following findings:
The parents of Brandon and Cameron are Antoinette, the mother and Howard, the father. The parents were married in North Carolina in 1986, separated in November, 1992 and divorced in May, 1994. Antoinette had been previously married and had the older child, Allen, who is now 14 years of age. Allen's father is deceased. Allen has been considered, in many respects to be part of the Antoinette/Howard C. family and the extended paternal family.
Both parties acknowledge that domestic violence was a factor in their decision to separate. At all times pertinent, the mother had custody of the children, during the marriage, after the separation of the parties and after the dissolution of the marriage. After the parties separated the mother frequently moved to various communities in North Carolina and nearby Virginia until 1995 when she and the children moved to Orlando, Florida.
It is not adequately explained how the children's father obtained a Juvenile and Domestic Relations court in Virginia to give him custody ex parte but in May of 1995, he secured a custody order and went to Florida, where Antoinette and the children were residing, to take custody of his two children. Howard obtained custody of the children with the aid of the police and returned to North Carolina. He kept the children until approximately August of 1996 when Howard allowed Antoinette to have all three children, according to Antoinette.
Following some robust relocations in Canada and New York, Antoinette, her new husband Cleveland, and the three children settled in to Hartford, CT. It is likely that Antoinette violated a visitation agreement and a Virginia court order when she kept the two younger children with her in Connecticut[2]. On or about October 18, 1996 the Department of Children and Families ("DCF") became involved with the case when the mother was arrested, upon a complaint by Howard, for custodial interference and all of the children were placed in foster care. The parties have stipulated to these and other facts including the fact that "[T]he custodial interference charge against the mother has been dropped by the state of North Carolina".
When questioned by authorities, all three children indicated that they had been beaten by Howard with a belt, and that their father would leave them for days on end with his girlfriend, who CT Page 13635 would also beat them. None of the children wanted to return to North Carolina. One of the children was examined by a school nurse and a police officer who observed two belt mark scars on the buttocks. The child said at the time of the beating his buttocks were bleeding. Both Brandon and Cameron separately told the police officer that they were afraid of their father. Both children were given the opportunity to go with their father or go to foster care. They both chose foster care. The Department of Children and Families ("DCF") was notified, mother was arrested on the fugitive warrant, and the children were placed in foster care.
While the attention of all counsel in examining the witnesses focused on the issue of whether strapping a child with a belt is an appropriate form of discipline, this case is not concerned about what form of discipline is approved in Connecticut or North Carolina. Dr. David Mantell very succinctly and accurately captured the essence of this case on page 2 of his second report dated October 31, 1997:
 "It is important for the reader to understand the seriousness of the chronic pressure that has been brought to bear on the children and the degree of disruption that the continuing custody contest between the parents has wrought on their lives. The available information indicates that the children's basic residential pattern has been continuously disrupted with moves from State to State, from home to home, and from school to school, with a persistent pattern of residential transience especially when in their mother's care. Additional high-risk traumatic stressors include the allegations of domestic violence between the parents witnessed by the children, the children's exposure to the father's sexuality, the children's exposure to the mother's substance abuse and the substance abuse of the stepfather, the physical discipline/abuse of the children while in father's care, and certainly the established conflict between the parents for the primary loyalty of the children which has apparently enveloped their conscious lives. Both parents accuse the other of criminal misconduct. The father told me that the mother is a fugitive from justice and the mother indicated that the father too has passed bad checks. The cultural conflict between the mother and father is extreme, the father and paternal grandparents representing a conservative, religiously based, law and order and family value philosophy and life discipline, and the mother CT Page 13636 reportedly a carefree, self-indulgent, and individualistic lifestyle. The apparent preference of the children to be with their mother was established in the earlier study. There is no doubt that the children have great anxiety about their lives being disrupted again and about being separated from their mother. The impression has been that the children associate any contact with their father and his family with a loss of the mother which is apparently a correct perception given the manner in which their lives have unfolded and the father has re-entered it at least each of the last two times the mother eloped with the children."
The children's mother Antoinette, submitted to psychological testing which showed her to have marked elevations in characteristics for social alienation and bizarre thoughts. Persons with this profile have sever psychological adjustment problems, overreact to criticism and to minor problems with anger and hostility. Persons with this profile trust no one, are constantly on guard for expected harm and injustice. Dr. Mantell believed her to have a possible diagnosis as Paranoid personality. Dr Mantell believed however that in her real life social situation, that she is under stress and scrutiny and feels herself to be the target of a systematic effort on the part of Howard's family to remove her children, and that these perceptions are reality based and may have contributed to high loading for the test responses indicative of the paranoid diagnosis.
The court finds Antoinette to be a manipulative and controlling person who has done whatever she pleases without regard for legal or social convention. She is at times charming whatever she pleases without regard for legal or social convention. She is at times charming and at other times, profane and antisocial.
With respect to the father Howard, he was not tested and evaluated by Dr. Mantell, although he did have an interview. The court is satisfied that Howard has a genuine interest in his children. His children have a strong aversion for him at this time and view him as a threat to their relationship with their mother. The evidence supports a finding that his children have witnessed domestic violence in his household. Domestic violence involving a child's parent is always and everywhere, devastating to children. One of Howard's children acted out in foster care in a very sexually inappropriate manner. The child indicated that he CT Page 13637 had observed his father and his father's girlfriend engaging in similar conduct.[3] There is sufficient credible evidence to find that the children had been strapped with a belt while in Howard's care to such a degree as would warrant a finding of abuse in either North Carolina or Connecticut.
Adjudication
The court finds by a fair preponderance of the credible evidence that the children Brandon and Cameron have been neglected by both parents in that they each have permitted the children to live under conditions, circumstances or associations injurious to their well being. Allen similarly has been neglected by his mother in that he has been permitted to live under conditions, circumstances or associations injurious to his well being.
Disposition
The court specifically finds that the paternal grandparents are suitable and worthy persons to serve as guardians for these children in the event that the parents are otherwise disqualified.
Dr. Mantell tried to arrange a visit with the children and the paternal grandparents while they were in Connecticut for an evaluation. Dr. Mantell thought that the paternal family mismanaged the visitation opportunity. They were offended and critical of the appearance and hair style of the children "There was much noise, strong statements and great emotion." Some family members were in travail and distress openly crying at the appearance of the boys. Brandon said his grandfather and aunt told him he looked like he was on drugs. The clash of cultures, urban Connecticut community vs rural North Carolina, created a great barrier to the attempted visit. The paternal grandparents and family did not seem to understand that the children are attempting to adapt and be accepted in the urban setting. They do not need or deserve, divisive criticism. They do need unequivocal, simple, acceptance and love. Regrettably, the extended paternal family was both critical and unaccepting of the children as they found them. This was compounded by the fact that the extended paternal family represents a threat to the children's placement with their mother.
The problem of disposition is that while both parents have CT Page 13638 distinctively disqualifying features, the children are in fear of the paternal family and vigorously resist leaving their mother. Dr. Mantell found that:
1. The children are more strongly attached to their mother than their father.
2. The children have been physically abused by their father and bear strong resentment against him and the paternal family.
3. The children are so fearful of separation from their mother that any thoughts of contact with their father and paternal grandparents prompts an anxiety reaction (in the children).
4. Further, any attempt to separate them from their mother would cause the children an unacceptable level of distress.
In spite of the personality disorder of the mother, her residential transience, her repeated legal difficulties and rule violations, she is able to adequately care for the children under supervision, according to Dr. Mantell. There is however, yet another unsettling issue; her husband, Cleveland.
He is a former friend of Howard in North Carolina. That alone causes some considerable tension in the relationship between Howard and his former wife. Additionally, Cleveland is likely a substance abuser. Dr David Mantell found Cleveland to be a very difficult interview. "He was nervous and evasive and spoke as if he were intellectually dull and at times as if he had comprehension problems. He seemed to be a limited man who had a hard time making a living in the past and who still is having a hard time now." Further evaluation for alcohol and drug abuse was recommended.
Cleveland submitted to a "substance abuse/dependency evaluation" by the Wheeler clinic. (Exhibit # 17). The report, which appears credible on its face, concludes, after noting that Cleveland has tried cocaine and marijuana, that "Client was very cooperative during the session and seemed motivated to comply with recommendations to help his wife's custody case. He admits to drinking 3-4 days per week, having 1-2 beers, but he may be minimizing his use and its effects on the family. He appears motivated to be a good father to his step-children as shown by his efforts in communicating with them and in helping care for them. Recommendation would be for substance intervention group CT Page 13639 due to his minimal treatment history and may be minimizing the effects of his abuse." His drug screen was negative for the presence of illegal and controlled substances. While Howard told DCF investigators that Cleveland had an extensive criminal history in North Carolina, a criminal record check showed only motor vehicle violations.
Dr. Mantell testified that Cleveland provides care and transportation for the children, they speak of him affectionately and the view him as a father figure. DCF has correctly tried to keep him out of the house (without much success) since he tested positive to cocaine on one occasion. He has subsequently undergone the substance abuse evaluation and tested negative for illegal substances. The court is satisfied with his explanation that this was an isolated incident nearly a year ago and that it will not occur again. He recognizes that this will greatly imperil Antoinette and may result in the removal of her children.
This presents the problem of whether his presence in the home is an unacceptable risk to the children or a benefit. Dr. Mantell agreed that this was a troublesome dilemma. Substance abuse is an inherently dangerous problem. Alcohol intoxication generally produces three bi-products according to Dr. Mantell: 1) incoherence and consequently bad judgement, 2) sexual excess and 3) violence. All of these three things present problems within a family. The ill effects of cocaine abuse are magnified exponentially. This court has previously expressed to Antoinette that the use of cocaine in her home by anyone will not be tolerated and shall constitute grounds for immediate removal of the children.
ORDER OF PROTECTIVE SUPERVISION
The court has weighed all of these conflicting and mostly negative environmental factors for these children. They require counseling to deal with the upheaval and conflict that they have experienced. They desperately require a cessation to the hostilities that the bitter custody disputes have produced. They urgently ask to stay with their mother. Whether this is in their long-term best interest is uncertain. The court can only try to provide some structure and guidelines in the hope that the parents will end their destructive behavior and put the needs of the children first.
Based upon the adjudication of neglect, and pursuant to CT Page 13640 General Statutes 46b-129, the court orders that the children be placed in the custody of the mother Antoinette Green under Protective Supervision and subject to the conditions set forth herein;
1) Parental noncompliance with this order shall be ground for a modification of this disposition.
2) This order shall be effective for one year from the date of this order subject to extension as provided in Practice Book § 1045.1 and applicable General Statutes.
3) An in-court review shall be held on Monday, November 2, 1998 at SCJM, Plainville, CT. at 10 am, unless sooner warranted and directed.
4) Visitation is to be arranged by agreement of the parties, or if they are unable to agree, as may be ordered by subsequent order of the Superior Court for Juvenile Matters or modification of the parents' decree of dissolution of marriage. A copy of this decision shall be released, disclosed and provided to any court reviewing the issue of the children's custody and/or visitation in Connecticut, Virginia or North Carolina. This court specifically finds that visitation with the paternal grandparents is appropriate and in the best interests of the children. The court recommends visitation in North Carolina during the children's late winter/early spring recess for six days and five nights, as well as extended summer visitation at the paternal grandparent's home provided the visitation is consistent with therapeutic recommendations. Immediate communications should be implemented and visitation permitted in Connecticut upon reasonable notice. Care should be taken to ensure that the success of the visitation is not sabotaged by any person or persons. Transportation should be arranged and financed entirely by the father. This court accepts the assurance of the paternal grandmother that she will insure the return of the children to Connecticut following visitation. The children's father may visit the children under the supervision of the paternal grandparents until such time as the children are comfortable and secure in his presence. In no event shall corporal punishment be used as a form of discipline. This will avoid any possible exaggerated or overstated claims of abuse.
5.) Antoinette is required to cooperate with DCF social workers to allow for home visits, to monitor the conduct of her husband, CT Page 13641 and to privately conference with the children, as necessary.
6) Antoinette is to execute written releases to allow DCF to monitor the children's progress and attendance at therapy and school. The confidential communications between the therapist and the patient are not to be disclosed, only progress and attendance.
7.) Antoinette and the children are to participate in a course of intensive individual therapy and follow the recommendations of the therapists. A copy of this decision and of Dr. Mantell's reports are to be released to mother's therapist and to the children's therapist. It is very important that the therapists' know of Dr. Mantell's findings.
8) Antoinette is to complete a DCF approved course of therapy in anger management.
9) Antoinette is to facilitate the exchange of gifts from the extended paternal family, to allow telephone communications from the extended paternal family and to allow the children to receive written correspondence from the paternal family. The court finds that the North Carolina roots and history of these children provides a rich cultural heritage which the children should know and share.
10) The Attorney General, as petitioner's representative shall direct by registered mail return receipt requested, a copy of this decision to be sent to the clerk of the Virginia court issuing the order of custody and the clerk of the Rockingham County, North Carolina court or such other court as issued the decree of dissolution of marriage, pursuant to the Uniform Child Custody Jurisdiction Act. In order to facilitate identification of the parties, the full name of the respondents, dates of birth and their current addresses shall be provided to the recipient courts.
11) A copy of this decision shall be provided to the paternal grandparents by respondent father's attorney.
BY THE COURT
Francis J. Foley, Presiding Judge. Child Protection Session CT Page 13642